1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF OREGON

3     UNITED STATES OF AMERICA,          )
                                         )
4                       Plaintiff,       ) No. 05-60008-2-HO
                                         )
5        v.                              ) April 1, 2010
                                         )
6     PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                         )
7                       Defendants.      )

8

9                   TRANSCRIPT OF ORAL ARGUMENT

10            BEFORE THE HONORABLE MICHAEL R. HOGAN

11             UNITED STATES DISTRICT COURT JUDGE

12

13                            -:-

14

15

16

17

18

19

20

21

22

23                  Deborah Wilhelm, CSR, RPR
                          Court Reporter
24                      P.O. Box 1504
                      Eugene, OR  97440
25                      (541) 431-4113

```
 1                    APPEARANCES OF COUNSEL

 2

 3   FOR THE PLAINTIFF:      CHRISTOPHER L. CARDANI
                             United States Attorney's Office
 4                           405 E. 8th Avenue, Suite 2400
                             Eugene, OR  97401
 5                           (541) 465-6771
                             chris.cardani@usdoj.gov
 6
                             CHARLES F. GORDER, JR.
 7                           United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
 8                           Portland, OR  97204-2902
                             (503) 727-1021
 9

10   FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                             Lawrence Matasar, P.C.
11                           621 S.W. Morrison Street
                             Suite 1025
12                           Portland, OR  97205
                             (503) 222-9830
13                           larry@pdxlaw.com

14                           STEVEN T. WAX
                             Federal Public Defender
15                           101 S.W. Main Street, Suite 1700
                             Portland, OR  97204
16                           (503) 326-2123
                             steve_wax@fd.org
17

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATIONS

2    FOR THE PLAINTIFF:      Direct   Cross     ReD      ReX

3    Colleen Anderson          21       22      --       --

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Thursday, April 1, 2010; 9:54 a.m.)
 2                    P R O C E E D I N G S
 3          THE CLERK:  Now is the time set for the matter
 4    of the United States of America versus Pirouz Sedaghaty,
 5    Case Number 05-60008, time set for oral argument on
 6    Motion Number 181 to suppress evidence, and Motion
 7    Number 205 for additional specification of basis for
 8    suppression based on dissemination of information to
 9    Russian FSB and request for discovery.
10          MR. GORDER:  Good morning, Charles Gorder for
11    the United States with Chris Cardani.
12          THE COURT:  Good morning, everyone.  I just put
13    a new hearing aid battery in.  That does not mean I'm
14    seeking long arguments.
15          I read the supplemental memorandums just filed
16    by the defendant this morning.  But, actually, I had
17    the -- Judge Walker's opinion last night.
18          MR. CARDANI:  Good morning, Your Honor.
19          THE COURT:  Good morning.
20          MR. CARDANI:  I think we need some direction
21    from the court in terms of what the court's expectations
22    are for today's hearing.  By listening to the docket and
23    our understanding, what this is is a continuation of a
24    lengthy hearing we had last year.  And that was when
25    Colleen Anderson testified at some length about the
```

conditions in which the search warrant was obtained, the

warrant was executed, the computers were taken, and

subsequently analyzed.

Extensive cross-examination was done.  And

there came a point where the defense tried to ask

questions that would have gotten into some classified

information.  We objected because the setting was

inappropriate.  And I think it was on that basis that

the court did not conclude the hearing and issue its

opinion.  But I think that we had fully resolved all of

the garden-variety issues that we needed to in that

hearing.

After that, the case of CDT was decided by the

Ninth Circuit.  So that led to a series of briefings,

and we have fully briefed that.

And the defense filed a supplemental motion

alleging that Colleen Anderson presented inconsistent --

presented false testimony, in essence, during the

suppression hearing.  We responded to that.

She did another affidavit that we're going to

tender to the court right now.  But I think that -- and

there were a few other matters addressed in that.  But

in terms of the motion to suppress itself, CR 181, that

has led to a series of subsequent motions and responses,

I think we've largely had the testimony that the court

1    needs to make its decision.

2         But if the court needs to -- we don't think

3    that a classified hearing is necessary.  But, again, if

4    the court thinks that there is something that's not been

5    covered that needs a classified hearing, then we can do

6    our best to get through that.

7         In addition, Mr. Wax sent me and Mr. Gorder an

8    e-mail, I believe it was yesterday, asking us to have

9    two other witnesses available.  Mr. Smith from the IRS,

10   and Mr. Christianson from the IRS.  Those witnesses were

11   not subpoenaed.

12         (Reporter interruption.)

13         MR. CARDANI:  Judge, these two witnesses, there

14   has been no real notice that we needed these witnesses

15   here.  We don't think that we need to present testimony

16   on them, but they disagree.  And if the court wants to

17   hear their testimony, Mr. Christianson is on the East

18   Coast.  And nobody notified us that we needed to have

19   him here.  We could make arrangements for telephone

20   testimony, if we needed to.  We haven't prepared him for

21   testimony.  And then Mr. Smith is a local agent in Bend,

22   but he's on a search warrant this morning doing

23   current -- the computer work on a search warrant in

24   Idaho.  We contacted him last night, given this recent

25   e-mail, and he could be available by phone this

1  afternoon.  We haven't prepped him.  But I don't want to

2  run afoul of the court's desires here.  If we -- we all

3  would like to get this matter resolved, but we keep

4  getting these requests which generate an inquiry on our

5  part on how far do we need to go to get this matter

6  concluded.  We don't want to run afoul of the court's

7  desires.

8          So we have Mister -- we have Agent Carroll here

9  from Medford, if something comes up requiring his

10  testimony.  We have Agent Anderson to adopt her new

11  affidavit.

12          THE COURT:  No, go ahead.

13          MR. CARDANI:  But in terms of the actual search

14  warrant and the CDT implications, Judge, we think the

15  briefing is done, and no real testimony is necessary.

16          Then there is another motion that's -- the only

17  other motion that is formally up for grabs right now on

18  the docket is the supplemental motion to suppress based

19  on the information that was disclosed by the government

20  to the Russians.  That matter has been fully briefed and

21  that's, I think, ready to be determined.

22          There have been a number of other things

23  addressed to the court involving evidentiary issues for

24  Saudi Arabia or for Egypt.  Those matters have been

25  briefed.  We're here to answer questions on that.  But

1  the basic inquiry we have for the court is what the

2  court's desires are for today in terms of what it wants

3  to get these matters resolved.

4        THE COURT:  All right.  I am going to hear from

5  defense counsel about the request for a closed hearing,

6  but in -- and I haven't reread the transcript of the

7  hearing before.  But as I've gone over this material

8  again to get fresh on it, I am satisfied that I have a

9  record adequate to make a decision.  But there was one

10  question I had that maybe you can remind me from the

11  record or if you had something to supplement on this, I

12  might give you the opportunity to do it, and that's the

13  search term Timimi.

14        What -- Ms. Anderson did testify that none of

15  the information she had came from classified sources.

16  But I'd like you to remind me where that term came from,

17  all right?  And so that -- as we go through this hearing

18  this morning, I'm interested in that.

19        Mr. Wax?

20        MR. WAX:  Judge, unfortunately, there is one

21  issue of fact with which we disagree with what

22  Mr. Cardani just said.

23        THE COURT:  All right.

24        MR. WAX:  In the pleading that we filed on

25  October 15th, we specifically stated that further

1   hearing is required in order to question Mr. Smith and

2   Ms. Anderson about their knowledge regarding the

3   chronology and extent of the computer review.

4          You may recall that at the hearing in July, we

5   did not have available to us any reports from either

6   Mr. Smith or Mr. Christianson.  The government provided

7   those reports from their computer people to us only

8   after that portion of the hearing had been concluded.

9          Upon review of those reports and comparison of

10  those reports with Ms. Anderson's testimony at the

11  hearing in July, we filed the supplemental pleading in

12  October pointing out what we believe to be

13  inconsistencies, and the need for testimony.  At that

14  point, I identified Mr. Smith, I did not identify

15  Mr. Christianson in that particular document.  So I

16  don't think that the government is fairly saying to the

17  court they had no notice that at least Smith was not

18  needed today.

19          THE COURT:  That doesn't matter at this point.

20  If you want to have questions and they're appropriate,

21  we'll find a way for you to do that.

22          MR. WAX:  Thank you.

23          THE COURT:  No one is to blame.

24          MR. WAX:  In terms of the question that you

25  asked about search term, there is another name on the

1    list that we need to discuss.  And I believe that if we

2    start to discuss it, that will lead to the same response

3    that came in July when the Timimi name was mentioned,

4    which is that we can't have that discussion in open

5    court.  So my recall with respect to the Timimi question

6    that you asked is that that was stopped because we were

7    in open court.  And there is one other name that we need

8    to inquire about that will probably lead to the same

9    result.

10           THE COURT:  All right.

11           MR. CARDANI:  Judge, I just want to make sure

12   that you clearly understand that that search term list

13   that we talked about in court wasn't an exclusive list

14   to use to search the computers.  I don't want that --

15   there to be a false illusion that we limited it to that

16   search list.

17           That was proffered to you as an indication that

18   we reasonably attempted to confine the search of the

19   computers --

20           THE COURT:  I understand that.

21           MR. CARDANI:  Okay.

22           THE COURT:  I'm more interested in the source

23   of it to Ms. Anderson.

24           MR. CARDANI:  Okay.  Very good.

25           THE COURT:  And if we need to close the hearing

1   to do that, we can.  That's really the only -- and if

2   there is another name, fine.  That's the one that I had

3   a question about.

4        MR. CARDANI:  Okay.  I think Mr. Gorder is

5   prepared to handle that.

6        MR. GORDER:  Your Honor, with regard to the

7   name Timimi, we have two points.  One, we have pointed

8   out time and time again that the defense has not pointed

9   to a single government exhibit that we intend to

10  introduce that has that term in it, which in a sense

11  they're putting the horse before the -- cart before the

12  horse.

13       None of the exhibits the government intends to

14  introduce at trial that came from the computer has

15  Mr. Timimi's name in it.

16       When Agent Carroll was testifying, he was asked

17  why that term was in there.  And he said he wasn't sure

18  whether he could testify to that, whether it was

19  classified or not.

20       We filed, after the hearing, and it's CR 206,

21  some exhibits of declassified FISA intercepts between

22  Mr. Timimi and Mr. al-Buthe.  And you have those

23  exhibits in the record.  Those are declassified now.

24  And they were intercepted pursuant to FISA, and were

25  played at the trial of Mr. al-Timimi.  To summarize

1   them, they were kind of high-fiving each other over the

2   crash of the Space Shuttle Columbia back in 2003.  And

3   Mr. Timimi was writing a poem of some kind to glorify

4   this destruction of the United States space shuttle, and

5   he was running this poem by Mr. al-Buthe.  That would be

6   reason enough to look for the term al-Timimi in the

7   computers.

8           But the major point is that there is no exhibit

9   that we intend to introduce that comes from that search

10  term.

11          THE COURT:  Those exhibits now have been filed

12  in our record?

13          MR. GORDER:  Yes.  They are CR 206.

14          THE COURT:  All right.

15          MR. WAX:  Your Honor, with all respect,

16  Mr. Gorder's statement that they don't intend to offer

17  at trial anything with Timimi's name misses the issue

18  that is before the court today which is the *Murray*

19  issue.  And whether or not the government intends to

20  offer anything with Timimi's name, and I will say these

21  other names because they are on the list that is not

22  classified, Sanad, and Enaam, and Abu Umar, the

23  provenance of those names is critical to the *Murray*

24  issue.  And the information that we had previously

25  provided to the court about the surveillance of

1    al-Haramain from the mid 1990s on, the unlawful

2    surveillance of al-Haramain, is now buttressed by the

3    opinion that came down yesterday from Judge Walker, and

4    all of the exhibits, which we were finally able to get

5    out last night, which are all of the exhibits that he

6    referenced in his opinion.  Now, it seems to us that you

7    now have before you one judicial finding and clear

8    evidence that there --

9            THE COURT:  Just to -- I don't mean to

10   interrupt -- well, I do mean to interrupt you, but it's

11   just to tell you that I haven't bothered printing out

12   800 pages of exhibits yet.  Go ahead.  So I haven't

13   reviewed those.  I haven't had time.

14           MR. WAX:  Well, Judge Walker, as we saw it, did

15   an excellent job of summarizing them, and we just wanted

16   to complete the record by having those exhibits in front

17   of you.  But the point is that the record in this case

18   shows now, including Judge Walker's finding, that there

19   was a nationally coordinated attack on Islamic charities

20   that was carried out through both lawful and unlawful

21   means.

22           And there is evidence before you, including

23   Judge Walker's finding, that that nationally coordinated

24   attack included an attack on al-Haramain USA, which

25   is -- the principal of which is our client, the

1    defendant in this case, Pirouz Sedaghaty.

2           The relevance of the questioning about Timimi

3    and the questioning that we believe we need to pursue

4    with respect to Enaam, Sanad, and Abu Umar, is to

5    complete the loop of the involvement of the people

6    outside of Oregon who were engaged in unlawful activity

7    in, as Justice Scalia said, the decision to undertake

8    this investigation that's the subject matter of these

9    hearings and that led to this indictment.  And it's not

10   clear to me and we can ask the court security officer

11   whether I can go into, you know, anything more about

12   Sanad in this setting.  But that name -- well --

13          THE COURT:  We're not going to ask him in court

14   right now.

15          MR. WAX:  But there is another point to be

16   made.  May I consult with him for a moment?

17          THE COURT:  You may.

18          MR. WAX:  Thank you.

19          (Discussion held off the record.)

20          MR. WAX:  You may recall, Your Honor, that

21   there is in the unclassified record of the case a

22   summary of what was formerly classified material in

23   which the name Sanad appears.  And if I am recalling the

24   sequencing correctly, that unclassified summary

25   paragraph was produced after your review of material in

1   Washington, D.C.

2          How that name gets on to this search term list

3   we believe is critical to development of the *Murray*

4   aspect of the case.

5          THE COURT:  Mr. Wax, are you seeking a fishing

6   expedition based on a negative pregnant?

7          MR. WAX:  No, Your Honor.  We believe that

8   there is clear evidence in the record that -- it's not

9   "we believe."  There is clear evidence in the record

10  that the codefendant in this case and his U.S. lawyer

11  were the victims of unlawful government activity.

12          There is clear evidence in this case that

13  al-Haramain USA, again of which Mr. Sedaghaty was

14  principal here in Ashland, was the victim of unlawful

15  activity.  That's not a fishing expedition.  That's

16  evidence.

17          We know from the production of an unclassified

18  summary that there is classified evidence directly

19  relevant to this case and this prosecution in which the

20  name Sanad appears.

21          In addition on this search term list is the

22  name Abu Umar, which, if I'm recalling correctly, is

23  also in that unclassified paragraph.  Now, that's not a

24  fishing expedition.  Because you have before you Judge

25  Walker's findings, which fully corroborate what we had

1  previously given to you in several forms, including the

2  declaration of Colonel Patrick Lang, the former director

3  of Human Intelligence for the U.S. Department of

4  Defense, that the al-Haramain organization here in the

5  U.S. was subjected to continuous surveillance, lawful

6  and unlawful, for a prolonged period.  This isn't a

7  fishing expedition.  This is as clear evidence of

8  unlawful activity against our client as one could hope

9  to find.

10         From that, we need to be able to ask the next

11  question, we're not fishing, it's the logical next

12  question.

13         MR. CARDANI:  Judge, on the *Murray* issue, I

14  think that there really are two issues on the *Murray*

15  question.  The one is the affidavit and the search

16  warrant that were used to get the computers.  That has

17  been fully briefed by the government in CR 192.  And I

18  think that why this really is, with due respect to

19  Mr. Wax, why this is a fishing expedition is because the

20  two people critical to that warrant are right before you

21  in the court today, her and me.  She has already entered

22  an affidavit saying that she knew nothing about this

23  program, whatever it is, whatever became of it, she knew

24  nothing about it.

25         I knew nothing about it.  To this day other

1  than what I read in the newspaper and in opinions, I

2  know nothing about it.

3          So in terms of obtaining the warrant, the

4  warrant is pure.  It is completely devoid of anything

5  that spilled out of whatever program there was.

6          She has testified that there is an independent

7  basis for everything in the affidavit used to get that

8  warrant, including the computers.

9          I was the supervisor of this.  I worked very

10  closely with her.  I knew nothing about it.

11          Now, and what -- the -- what *Murray* requires is

12  a showing that even if something illegal did occur prior

13  to a warrant, if there is no revelation of the products

14  of that illegal surveillance, or if it wasn't done

15  because of that illegal surveillance, then there is no

16  problem with the warrant despite the previously illegal

17  activity.

18          Second, I think that what we're getting to here

19  is a *Murray* issue with respect to the actual search of

20  the computers, and did some illegal program result in a

21  phone call to Agent Anderson saying, "hey, check this

22  out, check that out."  This is a fishing expedition.

23          She was the one who did -- or controlled the

24  search.  The names that have been brought up today,

25  Enaam, Sanad, Arnout, she can testify that there were

1    reasonable reasons that have nothing to do with some

2    illegal -- alleged illegal program why those were

3    relevant to this investigation.

4         She knew nothing about this program.  And these

5    were independent terms that she came up with from

6    different sources, and she can tell you about that if

7    you choose to hear it, that led to her searching these

8    computers.  This is a fishing expedition.  And I just

9    urge the court not to allow this to become a

10   free-for-all, especially in a classified setting where

11   we're under limitations on what we can produce.  We have

12   to screen questions through FBI sources because this is

13   a big deal and classified information is only shared on

14   a need-to-know basis.

15        I mean, there is nothing more than I would like

16   but to open up the files of the U.S. Attorney's Office

17   and let these guys look at every shred of paper in this

18   thing, full, open discovery, and to prevent a morass of

19   motions.  But we can't do that here.  We do it in a lot

20   of our cases because, you know, it doesn't involve

21   classified evidence.  But the rules are different in a

22   case involving national security and classified

23   evidence.  That's why you have all of these FISA -- all

24   of these CIPA pleadings that have been filed and why

25   we're forced to play it a little closer to the vest.

1  But she can testify, if you want to hear about those

2  search terms.  And I think this will reveal it, for what

3  the court has said, a fishing expedition.

4       THE COURT:  Well, I probably do want to hear

5  that.  If you have something more to say, fine.  I'm

6  going to take a short recess.  If you want to speak

7  before that, that's fine.

8       MR. WAX:  Thank you, Judge.  I'll be brief.

9  For Mr. Cardani to say that he and Ms. Anderson knew

10  nothing about the TSP or PSP is not the relevant

11  question.  What you have in front of you is the U.S.

12  government's acknowledgement that there was a

13  coordinated attack on Islamic charities, focused on

14  al-Haramain.  You have before you the fact that this

15  investigation began -- and we gave you the first FBI 302

16  report with the case number of the 9/11 investigation.

17  We have Ms. Anderson admitting that there was

18  coordination with OFAC.  We have Director Szubin's

19  declaration that OFAC is coordinating here.

20       The question is:  Did someone in Washington,

21  D.C. as part of this coordinated effort with respect to

22  Islamic charities prompt -- that's all that is required

23  under *Murray* -- did they -- did that prompt the decision

24  to proceed with this search warrant?  And whether

25  Mr. Cardani and Ms. Anderson knew why there were -- they

```
 1   were being prompted is irrelevant.  If they were pawns
 2   in someone else's game, that's irrelevant.  If the U.S.
 3   government was making the decision at whatever level, go
 4   forth, guys, that's all we need to prove under Murray.
 5              THE COURT:  Okay.  We'll take a short break.
 6              (Recess:  10:20 until 10:23 a.m.)
 7              THE COURT:  Let's swear Ms. Anderson.  Please,
 8   Counsel, don't go over what she has already testified
 9   about.  All right.
10              THE CLERK:  Ms. Anderson, please step forward.
11              (The witness was sworn.)
12              THE CLERK:  Please take the witness stand.
13   Agent, can I have you please state your full name for
14   the record, spelling your last name.
15              THE WITNESS:  Sure.  Colleen Anderson,
16   A-N-D-E-R-S-O-N.
17              THE CLERK:  Thank you.
18              MR. GORDER:  Your Honor, is it your intention
19   just to have her testify about the three search terms I
20   mentioned?
21              THE COURT:  Yeah, actually, there are four:
22   Timimi, Enaam, Abu Umar, and Samon.
23              MR. WAX:  S-A-N-A-D, Sanad.
24              THE COURT:  Yeah, thank you.  I heard it and I
25   didn't look it up, Sanad.
```

1          MR. GORDER:  Your Honor, with regard to the

2     Sanad term, we may have some problems doing that in an

3     open session.  What is declassified and provided to the

4     defense should be good enough, but I just want --

5          THE COURT:  Go ahead with the other three then.

6                    DIRECT EXAMINATION

7     BY MR. GORDER:

8      Q.    Okay.  Ms. Anderson, in your list of partial

9     search terms, there is the name Enaam.  And I may be

10    mispronouncing that.  Do you recall, from unclassified

11    sources, why that name was relevant to you?

12     A.    Yes.  Enaam, with the last of Arnout, was an

13    individual that was under investigation for the -- what

14    we call the BIF for grift, Benevolence International

15    Foundation, I believe.  He had been charged, I believe,

16    with using charitable funds to purchase boots for the

17    mujahideen.  I believe he pled guilty.  I'm not sure

18    exactly what he pled guilty to.  But there was an IRS

19    agent on that case, and I cannot recall specifically if

20    the IRS agent on that case told me that there might be a

21    connection or if more than likely when I run the search

22    name Chechnya, there was an Enaam Arnout letter found in

23    the al-Haramain computers where someone within

24    al-Haramain was attempting to contact him for

25    information on how to get money or supplies and that

1    kind of thing into Chechnya.

2        Q.    Okay.  With regard to Timimi, do you recall at

3    this point how that term got on the list?

4        A.    I'm sorry, what I recall with Timimi was that

5    he was also under investigation.  And I can't remember

6    if it was the Virginia jihad, exactly who he was tied

7    to, but he was under investigation also.  And my

8    understanding was that he had ties to al-Haramain and/or

9    the defendant.

10       Q.    And, finally, Abu Umar, what did you know about

11   him or what do you know about him?

12       A.    Well, that would be Abu Umar al-Saif.  And I

13   learned about him from our terrorism consultant, Evan

14   Kohlmann, who specializes in Chechnya.  And my

15   understanding is Abu Umar al-Saif is the -- basically

16   the Chechnyan religious leader for the mujahideen.  He

17   was with them fighting in Chechnya, and he blessed them,

18   and was their -- basically the religious leader that

19   they looked up to, the mujahideen.

20            MR. GORDER:  No further questions, Your Honor.

21            THE COURT:  Cross.

22                      CROSS-EXAMINATION

23   BY MR. WAX:

24       Q.    Ms. Anderson, when did you learn the name

25   Enaam?

1      A.     Enaam, like I said, I'm not sure if I first

2   learned of the name from the IRS agent working the case.

3   Enaam Arnout, I believe, was one of the first cases I

4   was aware of where an IRS agent was assisting in the

5   investigation.  So I may have learned it from her or I

6   may have learned it from the search on the computer in

7   which, again, if you take a look at the letter that went

8   to Enaam Arnout from al-Haramain here in Ashland,

9   Chechnya is on it, there is other search terms that came

10  up.

11     Q.    Ms. Anderson, at the hearing last July, the

12  court directed that we be provided copies of any notes

13  that you had taken during any of your work on the

14  computer searches.  Did you take any notes at any time

15  during your work with either Richard Smith, Jeremy

16  Christianson, or any other computer person with whom you

17  worked on this case?

18     A.    I don't recall taking any notes.

19  Mainly when -- when dealing with my computer people, I

20  request them to do things either verbally or via e-mail,

21  and then they conduct the search, and they let me know

22  what the results are.

23     Q.    Mr. Smith's report, which was made available to

24  us after your testimony, states that he and you

25  interacted on numerous occasions in the spring and

1    summer of 2004, and that he was in your Medford office

2    on a number of occasions working directly with you and

3    showing you how to do things.  You took no notes at any

4    time?

5              MR. GORDER:  Your Honor, what does this have to

6    do with the three search terms that she testified about?

7              MR. WAX:  If there are notes, perhaps they

8    would refresh her recollection since she has told us she

9    does not have a specific recollection.

10             THE COURT:  I think she's already answered the

11   question.

12   BY MR. WAX:

13   Q.    Did you make any notes on your computer as

14   opposed to handwritten notes?

15             MR. GORDER:  Same objection, Your Honor.

16             THE COURT:  Go ahead and answer.

17             THE WITNESS:  The only notes -- maybe I

18   misunderstood the question, but the only notes that I

19   can actually recall making was when Rick had come and

20   trained me on the ILook program, and then I'd have to

21   make notes as to how, you know, I get into the program

22   and that kind of thing, but I didn't keep those notes

23   because then we switched programs, and I think at some

24   point I was using FTK and that kind of thing.

25   BY MR. WAX:

1    Q.    But no notes of any sort when -- if you learned

2  of the name Enaam from another IRS agent, you didn't jot

3  anything down?

4    A.    I didn't jot anything down?  If I did, I didn't

5  keep them because it -- that doesn't -- I don't recall

6  that.

7          MR. WAX:  May I have a moment, please, Your

8  Honor?

9          THE COURT:  Yes.

10          (Discussion held off the record between

11  co-counsel Mr. Matasar and Mr. Wax.)

12          MR. WAX:  Your Honor, I have a question about

13  Timimi, which I think I should wait if we're going to go

14  into classified session.

15          THE COURT:  Okay.

16  BY MR. WAX:

17    Q.    If I understood your grand jury testimony

18  correctly, during 2004, you were in frequent contact

19  with Evan Kohlmann?

20    A.    During 2004?  Well, I would say prior to

21  execution of the search warrant, yes, I had contacted

22  Evan Kohlmann to learn a little bit about Chechnya.  I

23  hate to say it, but I didn't know much about Chechnya,

24  even where it was at, so I contacted somebody that could

25  inform me about the country, its background, how long

1  the fighting has been going on, that kind of thing, yes.

2      Q.    How did you get steered to Evan Kohlmann as

3  your source?

4            MR. GORDER:  Objection, Your Honor, again.

5            THE COURT:  Sustained.

6  BY MR. WAX:

7      Q.    With respect to the time in 2004, after the

8  execution of the search warrant, when you were getting

9  information from Richard Smith and when you were working

10 with Richard Smith, were you not in frequent contact

11 with Mr. Kohlmann?

12           MR. GORDER:  Objection, Your Honor.

13           THE COURT:  Sustained.

14 BY MR. WAX:

15     Q.    When you were looking at the computer in 2004,

16 do I understand correctly from your grand jury testimony

17 that you would see things you wouldn't recognize or know

18 who or what you were looking at, and you would then

19 contact Mr. Kohlmann?

20     A.    I don't --

21           MR. GORDER:  Objection, Your Honor.  Again, I

22 don't see the relevance to the list of search terms.

23           THE COURT:  Sustained.

24           MR. WAX:  Well, that doesn't necessarily go to

25 the list of search terms, Your Honor, but it does go to

Anderson - X                                    27

```
 1   the other issues in the case about which we inquired

 2   last July with respect to the general rummaging, and we

 3   did not have at that time the grand jury testimony or

 4   the other reports.  So now that I have the grand jury

 5   testimony, I think that it -- I should be permitted to

 6   pursue that line of inquiry further.

 7            THE COURT:  I don't have any more.  The

 8   objection is sustained.

 9            MR. WAX:  Then I have no further questions.

10            THE COURT:  Thank you.  Cross?

11            MR. GORDER:  No, Your Honor.

12            THE COURT:  We will go into a classified

13   session.  We'll do it in the jury room.  The court

14   security officer will ensure that everyone is cleared.

15            MR. CARDANI:  Very good, Your Honor.

16   Ms. Anderson has indicated she needs --

17            THE WITNESS:  I believe I need to swear to my

18   declaration.

19            MR. CARDANI:  Yeah.  There is something else

20   that I would like to take care of, housekeeping.

21            THE COURT:  All right.

22            MR. CARDANI:  It's after the suppression

23   hearings, they filed a document, CR 230.  We responded

24   in CR 242.  And this is important to us because this has

25   been an allegation that she presented false testimony to
```

1    you during the suppression hearing.

2            Special Agent Anderson prepared a new statement

3    that is appended -- it is attached to CR 242.  And I'd

4    like to -- her to just adopt that.  And if the court had

5    any specific questions about that, we'd like to offer

6    that as well.

7            MR. WAX:  I object, Your Honor.  If I'm not

8    permitted to inquire about the search process, then I

9    don't believe that she should be --

10           THE COURT:  Could I have the document?  (Brief

11   pause.)

12           Well, I'm going to accept the declaration as

13   evidence.  You can cross-examine if you are -- on the

14   issue of -- if you believe this witness submitted false

15   testimony, you can cross-examine her about that, if

16   that's the position you are taking.

17           MR. WAX:  Can I cross-examine about paragraphs

18   6 through 12?

19           THE COURT:  You may cross-examine in an area

20   that you believe indicates false testimony.

21           Christy, you may return that.

22           MR. WAX:  Your Honor, the paragraphs 13 to the

23   end deal with the question of the inconsistency in the

24   timing.

25           Paragraphs 6 through 12, as I'm reading them,

1  deal with the subject matter that was gone into at the

2  hearing, which was not an allegation of false testimony,

3  but was a question of --

4          THE COURT:  We have two separate matters.

5  First, are you taking the position that the witness

6  submitted false testimony?

7          MR. WAX:  What we said in our pleading was

8  there was inconsistency between the testimony and some

9  documents, whether or not that's false --

10         THE COURT:  You don't have any questions about

11 that?

12         MR. WAX:  I will ask a question or two about

13 that, but I am not making an allegation of false

14 testimony.  We did not make an allegation of false

15 testimony.  We pointed out an inconsistency in a written

16 document and oral testimony.

17         THE COURT:  That's just argument, that's fine.

18         And, Mr. Cardani, anything on these other

19 paragraphs?

20         MR. CARDANI:  We filed this in response to a

21 post-hearing motion that they filed addressing some of

22 the issues that they brought up in the motion.  I tender

23 that.  If the court accepts that as her testimony and

24 wants to allow cross-examination on that, I guess I

25 don't have any objection, but I would urge the court if

1    it wants to hear this testimony to keep it constrained

2    and to prevent this from becoming, you know -- I don't

3    mean to besmirch Mr. Wax, but a free-for-all.

4              THE COURT:  Yeah, you can go ahead.

5              MR. WAX:  Thank you.

6              THE WITNESS:  Excuse me, Your Honor.  I think I

7    left my declaration up there.  I'd like to have them.

8              THE COURT:  All right.  Sure.

9    BY MR. WAX:

10   Q.    All right.  Ms. Anderson, in the declaration in

11   paragraph 9, you state that later in 2004, Mr. Smith

12   recovered some limited evidentiary data, numerous photos

13   of Chechen war battle scenes.  My question is this

14   first:  When do you recall that happening?

15   A.    I believe the reason I referred to "later in

16   2004" in my declaration was that I believe Mr. Smith

17   probably has that in his report, which I don't have in

18   front of me.

19   Q.    You don't have a recollection of it then?  We'd

20   need to get that from him?

21   A.    Well, I believe you have his report.  I gave it

22   to you in discovery.

23   Q.    You don't have an independent recollection of

24   when that occurred?

25   A.    No, I do not.

1    Q.    Okay.  Do you recall what battle type scenes

2   you saw when he provided those to you?

3    A.    Specifically the ones I recall are the ones

4   that I ended up using in the indictment, for the

5   indictment during the grand jury, those are the only

6   ones that I specifically recall.

7    Q.    Do you recall him providing you with

8   photographs that you could not identify?  You couldn't

9   determine was this Chechnya?  Was this Iraq?  Was this

10   Afghanistan, or something else?

11    A.    I do recall seeing some individuals that

12   appeared to have been -- you know, obviously, military

13   type of photo in which they are lined up, and they look

14   like, you know, they were people of importance.  So,

15   yes, I do remember seeing some of those types of photos

16   that I had questions about, yes.

17    Q.    Questions because you didn't know who the

18   people were or where they were from?

19    A.    Correct.

20    Q.    With respect to photos of that nature, you sent

21   some of those photos on to Evan Kohlmann?

22    A.    I did.  And it's in my grand jury testimony.  I

23   asked Mr. Kohlmann to identify what then became the

24   leaders of the mujahideen.

25    Q.    But the question is, you received photographs

1    from Smith?

2        A.    Uh-huh.

3        Q.    You didn't recognize who the people were in

4    some of them, or where the photographs were taken,

5    correct?

6        A.    Correct.  All I knew is that they were a

7    military type of photo, but yet it didn't look like U.S.

8    military or, you know, an actual country's military, so

9    I had questions if this was the mujahideen.

10       Q.    You then sent some of those photographs on to

11   Evan Kohlmann and obtained identifications from him?

12       A.    Yes.

13       Q.    Thank you.  Do you recall how many times you

14   sent material on to Evan Kohlmann for similar types of

15   identification?

16            MR. CARDANI:  Judge, I'm going to object.  I

17   think we've covered this.

18            THE COURT:  Yeah, all of this is long after the

19   search warrant, Mr. Wax.

20            MR. WAX:  Part of our complaint, Your Honor, is

21   that the search of the computers was unlawful because it

22   was not cabined either in time or scope.  So I believe

23   that this is directly relevant to one of the bases on

24   which we're seeking suppression of the fruits of the

25   searches of the computers.

```
 1              THE COURT:  The objection is sustained.
 2    BY MR. WAX:
 3      Q.    Now, Ms. Anderson, with respect to the last
 4    page of the declaration --
 5              THE COURT:  You mean page 4?
 6              MR. WAX:  Page 6.
 7              THE COURT:  Okay.
 8              THE WITNESS:  I don't have a page 6.
 9              MR. WAX:  In the document that was filed on
10    December 11th, our copy has six pages.
11              THE COURT:  Page 5 has a signature.
12              MR. CARDANI:  I think they are talking about
13    the attachment with the al-Haramain indicator on the
14    bottom right.
15              MR. WAX:  Yes, that's correct.
16              THE WITNESS:  I'm sorry, I didn't print that
17    out.
18              MR. CARDANI:  May I approach the witness, Your
19    Honor?
20              THE COURT:  Yes.
21              MR. CARDANI:  Does the court's copy have an
22    attachment?
23              THE COURT:  Yeah, I have that.
24              THE WITNESS:  Okay.  Thank you.
25    BY MR. WAX:
```

1    Q.    Ms. Anderson, in the pleading that we filed on

2    October 15th to which this declaration was in part

3    responsive, we listed a long series of documents with a

4    similar FPDUS number.  First, can you tell the court

5    what the FPDUS number means, if you know?

6    A.    I believe that that is the Bates numbering

7    system that the scanning company in Portland used to

8    scan the items.

9    Q.    So you recall that at some point there was a

10   joint agreement between the prosecution and defense to

11   take a large volume of material that was in the

12   possession of the government and have it scanned for our

13   mutual use, and that this numbering system was something

14   that we agreed on jointly to keep track of the

15   documents?

16   A.    I believe so.

17   Q.    And with respect to the pleading that we filed,

18   your declaration indicates that you had an opportunity

19   to look at it.  Do you recall that we listed -- I don't

20   recall how many -- but a long series of FPDUS numbers

21   that appeared to have your signature on them or on the

22   last page of them?

23   A.    Yes.  I believe I saw that you had listed

24   numerous FPDUS numbers on there.

25   Q.    And so that this particular document that's

1    attached to the declaration is just an example of many

2    such documents that were in that set of materials?

3        A.    Yes.  The ones that I saw were almost all bank

4    records.  I'm not sure if there is any other types of

5    records that were included in there.  I don't know that

6    I went through each and every one.  But the ones that I

7    saw and the one that's listed in my declaration is an

8    example from one of the Bank of America statements,

9    probably.

10       Q.    Yes, okay.  Now, in the fall of 2001, you

11   are -- are you aware that a number of subpoenas were

12   served on a number of different banking and perhaps

13   other institutions seeking the production of records

14   before a grand jury that had been convened to

15   investigate al-Haramain and/or Mr. Sedaghaty?

16            MR. CARDANI:  I object to the relevance of

17   this, Judge.

18            THE COURT:  Actually, I want to make sure I

19   understand the question.  Would you ask that again.

20   BY MR. WAX:

21       Q.    Are you aware that in the fall of 2001, a

22   series of subpoenas was issued at the behest of the

23   grand jury that had been convened to investigate

24   al-Haramain and/or Mr. Sedaghaty?

25            MR. CARDANI:  Judge, my objection is this:

1    This has to do with an allegation that she presented

2    false testimony by stating that she joined the

3    investigation in early 2002, and then they take a bunch

4    of documents that had already been subpoenaed as part of

5    the FBI's investigation and alleging that because those

6    were received in 2001, that she must have presented

7    false testimony.  This document was offered to show that

8    that is not the case.

9         I don't understand what the questioning has to

10   do with all these other subpoenas, whether it's relevant

11   to refuting the allegation that she's presented false

12   testimony.

13        THE COURT:  Sustained.

14        MR. WAX:  I'm just trying to lay a foundation

15   for how her signature gets on these, Judge, and what --

16   I mean, you have the document in front of you.  Right

17   now I don't know that the record shows where this

18   document came from and what it is.

19        MR. CARDANI:  That's --

20        MR. WAX:  And that's what I'm trying to

21   establish.

22        MR. CARDANI:  I have no objection if you ask

23   that of her.

24        MR. WAX:  That's what I'm trying to get to, but

25   we need to--

 1          THE COURT:  Just ask the question.

 2   BY MR. WAX:

 3      Q.     The document that is in front of you states on

 4   the top line of the printed section at the bottom "copy

 5   of records of al-Haramain," correct?

 6      A.     Uh-huh.

 7      Q.     What is that referring to?

 8      A.     The al-Haramain bank account.

 9      Q.     Records that were obtained by whom?  From whom?

10   In what way?

11      A.     Well, if you look at the second line on the

12   stamp, it says "copy furnished by B of A."  So these

13   particular records were subpoenaed from Bank of America.

14   And there are copies of records from the al-Haramain

15   bank account, and the date that they were received by

16   the investigation is November 19th.  And the special

17   agent is myself, because I have possession of those

18   documents now, and I am taking inventory.

19      Q.     This document is a document used by the FBI?

20   The IRS?  Or by whom?

21      A.     Well, this little thing here is actually just a

22   little stamp, you know, you put it in the ink and you

23   stamp it.  And in -- I would say in the old days or a

24   while back ago, it was customary, at least for me, and a

25   lot of the agents, to stamp documents, to put down when

1   the date that they were received, and from whom they

2   were received, so that was my custom back then to do

3   that.

4         Nowadays, a lot of times I'll just run a

5   memorandum saying I received these types of documents.

6   But back then, I just used to stamp them and put the

7   date that they were received.

8   Q.    It is not the business practice to stamp the

9   documents when they are, in fact, received from the

10  party from whom they've been subpoenaed?

11  A.    I guess it would depend on who is doing the

12  stamping.  I don't know what the FBI's business practice

13  is.  And, again, with the IRS, the way I do it may not

14  be necessarily the way another agent does it.  Like I

15  said, nowadays if I were to get records, I will create a

16  memorandum saying that I received the records from so-

17  and-so on this day.  So nowadays, I don't usually stamp,

18  no.

19  Q.    Did you take any notes or produce any reports

20  with respect to the work that you did in obtaining or

21  reviewing records such as those that are listed in our

22  pleading of October 15th?

23  A.    I think what you are asking me is when going

24  through these, did I create a report saying that I'm

25  going through these records?

1    Q.    Did you create a report that says "I reviewed,"

2   "I obtained from the FBI," "I obtained from the Bank of

3   America," whatever it is, did you create any report or

4   write any notes documenting when you actually took

5   possession of or received the documents that are

6   referred to in the pieces of paper such as page 6 of the

7   declaration?

8    A.    No, I don't make a notation when I join an

9   investigation, I don't make a notation of when I

10   received records from another agency, no.  I mean, we're

11   all part of the same investigation.  At the point that I

12   join the investigation, I am there to take over the

13   financials, and I just say, "hey, can I have the

14   financials?"  I'm going to do an inventory.  I'm going

15   to find out what's missing.  I'll contact the bank.  Get

16   whatever -- you know, that type of thing that's missing.

17   Sometimes on the computer, I'll take notes as to the

18   missing items, and then fax that to the bank and say,

19   "okay, this is what's missing, may I please have it?"

20   But those aren't really just notes.  Just kind of my --

21             MR. WAX:  I have nothing further.

22             MR. CARDANI:  No questions.

23             THE COURT:  You may step down.

24             THE WITNESS:  Thank you.

25             THE COURT:  We'll take the classified portion

1  in the jury room.  And, Scooter, if you can help us make

2  sure we've got the right people in there.

3          (The open court proceedings were adjourned from

4  10:57 until 11:13 a.m.)

5          MR. CARDANI:  Judge, a couple of things.

6          THE COURT:  Okay.

7          MR. CARDANI:  The computer search, when CDT

8  came out, I stopped the investigation of the computers

9  out of an abundance of caution, and that has to this day

10  been the case.

11          Documents have been coming in now from the

12  defense on exhibits that they plan on using from those

13  very computers.  We want to dig back into those

14  computers and resume our search to verify that they came

15  out of the computers and things of the like.

16          So we would like -- if the court is planning on

17  issuing a ruling, we would like acquiescence from the

18  court that we can resume that search.  And we would ask

19  that that be done sooner rather than later, if possible.

20          THE COURT:  I don't consider that case

21  retroactive.  And you will get a ruling right away on

22  these motions now.

23          MR. CARDANI:  Thank you.

24          Defense expert reports, I understand from

25  Mr. Wax and Mr. Matasar now they've named a number of

1    experts on their witness list.  We don't have expert

2    reports.  And we would just ask that they be provided to

3    us, again as soon as possible.

4         MR. WAX:  As soon as we have them, they'll be

5    provided.

6         MR. CARDANI:  There is an issue that I want to

7    flag for the court and I hope we can resolve this, but I

8    want to bring it to your attention because it could be

9    highly problematic if it can't be resolved.  Several of

10   our exhibits, starting with this -- the letters AHIF,

11   al-Haramain, are documents that we obtained after

12   serving a subpoena for the books and records of

13   al-Haramain in Ashland.  Colleen Anderson served it on

14   some female employees of al-Haramain.  Mr. Sedaghaty was

15   out of the country.  I then got a call from Mr. Matasar,

16   who said he represented Mr. Sedaghaty and al-Haramain,

17   and was going to handle return -- handle the subpoena as

18   well.  We did that.  And we allowed Mr. Matasar to

19   collect the records and present them to Colleen Anderson

20   without having to appear before the grand jury and

21   testify as to their authenticity and things of the like.

22   It's a very customary procedure.  It's a courtesy we

23   extend to lawyers all the time.

24        We need to get those records into evidence.

25   And so we don't want to make Mr. Matasar a witness in

1  any way, shape, or form, in this trial, but we need a

2  stipulation from the defense that allows us to get those

3  records authenticated in a way that comports with the

4  rules of evidence.

5      So I've raised this with Mr. Matasar and

6  Mr. Wax.  We've proffered to them a stipulation that we

7  need.  And the conversation Mr. Wax and I were just

8  having was that we need to meet, apparently, and there

9  is a possibility we can work something out.

10     If we can't, we're going to need to be heard by

11  the court to deal with this matter.

12     THE COURT:  I'll bring you in quickly if we

13  need to do it.

14     MR. CARDANI:  The last matter that I had to

15  raise with you is that we want to get an extension of

16  time to file motions in limine and to object to each

17  others' exhibits; is that correct?

18     MR. WAX:  (Nodding head.)

19     MR. CARDANI:  And the proposal is how long?

20     MR. WAX:  Several weeks, I think.  Yeah.

21  Judge, we see that the government's request for a

22  stipulation on the AHIF records relates to a larger

23  question of the admissibility of many of the other

24  documents the government has included, and they may have

25  issues with respect to some of the documents we

1  included.  We thought that it might make more sense for

2  us to see if we can work out something on at least some

3  of the exhibits before filing motions in limine and see

4  if we can pair it down.  And we're thinking if we could

5  try to get together perhaps the middle or the end of

6  next week, get the motions to the court with the

7  portions that are needed, perhaps two weeks from the

8  5th, if that will be --

9          THE COURT:  Mr. Baker, does that foul our

10 schedule up?

11         (Discussion held off the record.)

12         MR. CARDANI:  If it's okay with the court, what

13 I'm understanding we're agreeing to is the extension of

14 time to file objections to exhibits and for motions in

15 limine to be filed, which is presently set for Monday,

16 April 5th; and the proposal is to extend that to Monday,

17 April 19th.

18         MR. WAX:  If that's agreeable with the court.

19         THE COURT:  Yes.

20         MR. CARDANI:  And then the responses were due

21 two weeks later.  Will those be backed up by two weeks

22 as well?

23         THE COURT:  Yes.

24         MR. CARDANI:  To May 3rd.  And then our only

25 issue is, of course, what the court just noted, and

1    that's the overall schedule in the case.

2              THE COURT:  That's what I'm concerned about.

3              MR. CARDANI:  This could hugely impact things

4    like people coming over from Russia and the

5    admissibility of a big chunk of the government's case,

6    so we're concerned about the scheduling, but we'll

7    accede to them.

8              (Discussion held off the record.)

9              MR. CARDANI:  Judge, what we just talked about

10   is if we could say that we'll agree to a one-week

11   turnaround on the exhibits -- I'm sorry, on these

12   motions in limine and the objections.  So those were due

13   on April 19th.

14             MR. WAX:  Turn around to the 26th.

15             MR. CARDANI:  Monday the 26th.

16             THE COURT:  Response by the 26th.

17             MR. WAX:  Could we do the 27th, Judge?  That

18   will just give us one extra day, if that works in terms

19   of -- does that work?

20             THE COURT:  We don't have the option of putting

21   on extra staff like you do.

22             MR. MATASAR:  Then we can have the replies

23   due --

24             THE COURT:  David, can we handle this or not?

25             MR. BAKER:  What is the hearing date?

1          THE COURT:  The hearing date, I don't know.

2          MR. WAX:  We'll file pleadings on the 19th, and

3   then any -- what should be the last pleading on the --

4   Tuesday, the 27th.

5          THE COURT:  Do we have a hearing date for those

6   motions?

7          MR. BAKER:  We have set a hearing date.

8          MR. GORDER:  Yes, Your Honor, the hearing date

9   is May 10th.

10          THE COURT:  That's fine.

11          MR. WAX:  Thank you.

12          MR. CARDANI:  Now, we've got another issue and

13   that's the *Daubert,* all kinds of experts.  And if we

14   don't have expert reports, we can't prepare for a

15   *Daubert* hearing.  So all of our reports for the experts

16   are in their possession.  They've been there for a

17   while.  But we can't do our work unless we have the

18   expert report.

19          MR. WAX:  We are working with them as rapidly

20   as we can.  And we can probably get you -- sit down and

21   give you some informal additional input today when we're

22   done here, if you would like.

23          We're anticipating at this point, Judge, one

24   *Daubert* challenge to the government's experts, and

25   that's on Evan Kohlmann.

1        And in terms of the experts we've identified, I

2   mean, we have a CPA, who's the forensic C -- well, we

3   can go into that later.  We don't need to take up your

4   time.

5        THE COURT:  If it looks like we're running into

6   a time problem, let me know.  Because if we have any

7   hearings on *Daubert* issues, those are going to happen

8   before the trial.

9        MR. WAX:  Yeah.

10        MR. CARDANI:  Which is on June 7th.

11        THE COURT:  Uh-huh.

12        MR. WAX:  That's the date we're putting on our

13   subpoenas.

14        Judge, one other comment with respect to the

15   Matasar-as-a-potential-witness issue.  We have told the

16   government that we will not be raising any chain of

17   custody issues with respect to the documents that were

18   provided in response to the subpoena.

19        The issue that we see is Mr. Matasar is not in

20   a position to testify about authenticity or anything

21   else that would render them relevant.  So I just want to

22   be clear that the government understands that it's not

23   an issue about where they came from through Mr. Matasar.

24   The question is under the evidence rules.  And we have,

25   I think, now covered everything that we needed to

```
 1    bring -- no.
 2             MR. MATASAR:  There is two things.  There is --
 3             THE COURT:  You have five minutes left,
 4    Mr. Wax.
 5             MR. MATASAR:  We're well within the five
 6    minutes.
 7             MR. WAX:  Are we going to have further
 8    testimony from Mr. Smith on the computer search issues?
 9             THE COURT:  You can give me a letter by
10    tomorrow describing what you want to ask, and you can
11    give me a response by Monday, your response to that.  If
12    we have further testimony, it will be next week.
13             MR. WAX:  Thank you.
14             MR. MATASAR:  I am a bad client, Your Honor, in
15    the sense that I have told Mr. Cardani that I didn't
16    want to deal that much myself with the issue of me being
17    a witness, because I take it very seriously when one
18    lawyer on one side asks the lawyer -- tells the lawyer
19    on the other side that he or she may be a witness in a
20    trial, but I see -- I'd like to get this somehow, if we
21    could, just off the table.
22             A lawyer who provides records pursuant to a
23    subpoena cannot be, as I see it, a witness to
24    authenticate the records under the hearsay exception.
25    So I'm just not sure why I -- why this is out there.
```

1    And it would ease my mind greatly and ease our

2    preparation greatly, if somehow we could get some

3    clarity sooner rather than later rather than leave it be

4    hanging out that I may be a witness at the trial, which

5    I really would prefer not to be, even if I could be, I

6    don't know what that means about my role in the case,

7    et cetera.

8            MR. CARDANI:  No one wants to call Larry

9    Matasar as a witness.  He's not on our witness list.

10   The problem is we've got to get exhibits in.  And the

11   ordinary way we would have done this if we knew it might

12   be a problem is to have a custodian of record show up at

13   the grand jury and be the authentication witness for

14   trial.  We gave a professional courtesy, as we always do

15   to Mr. Matasar, to give us the records --

16           THE COURT:  Either work out authenticity or

17   designate the custodian, please.

18           MR. CARDANI:  That's fine.

19           MR. WAX:  We will be discussing those issues --

20           THE COURT:  There is a third option, and it's

21   not what Mr. Matasar wants, nor do I.

22           MR. WAX:  I think, Judge, that the suggestion

23   that we designate a custodian may be an impossibility.

24           THE COURT:  You work on that.

25           MR. WAX:  So that's why Mr. Cardani is looking

1    to Mr. Matasar because it's the government that has the

2    problem here, and they are attempting to solve their

3    problem through Mr. Matasar, which we think is

4    inappropriate.

5          MR. MATASAR:  Even if I weren't a lawyer, how

6    can I authenticate that business records were kept in

7    the ordinary course of business three years before I

8    knew anything about the case?  I don't think I could be

9    a witness.

10          THE COURT:  You're just lucky you can argue

11    about it.  When Mr. Ransom subpoenaed me years ago,

12    asked why he couldn't find any search warrants in the

13    clerk's office that I had not issued, and there was a

14    reason for that, of course, I say "it's not good enough,

15    take it away."  We're in recess.

16          (The proceedings were concluded at 11:26 a.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Deborah Wilhelm, Certified Shorthand Reporter for the State of Oregon, do hereby certify that I was present at and reported in machine shorthand the oral proceedings had in the above-entitled matter. I hereby certify that the foregoing is a true and correct transcript, to the best of my skill and ability, dated this 1st day of April, 2010.

/s/ Deborah Wilhelm
_____
Deborah Wilhelm, RPR
Certified Shorthand Reporter
Certificate No. 00-0363